UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| **THE ESTATE OF KIMBERLY KERTZ**, and **PAULA KERTZ** | ) ) ) | |
| Plaintiffs, | ) ) | Cause No.: |
| vs. | ) ) | |
| **CITY OF CRYSTAL CITY,** | ) ) | **PLAINTIFFS DEMAND TRIAL BY JURY** |

**CITY OF CRYSTAL CITY,**
SERVE:        Jason Eisenbeis, City Administrator   )
               130 Mississippi Avenue                     )
               Crystal City, MO 63019                      )
                                                                    )
**EDWARD "EDDIE" ROBINSON,**                      )
**Detective Sergeant, Individually,**                   )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**KYLE BOYER, Sergeant, Individually**          )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**JAMES LINK, Detective Sergeant, Individually,** )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**CURTIS PULLEN, Officer, Individually,**       )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**TIMOTHY BENNETT, Officer, Individually,**  )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**JEFF PRICE, Dispatcher, Individually,**       )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**KRISTINA LONG, Dispatcher, Individually,** )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )
**KATHY FORESTER, Dispatcher, Individually,** )
SERVE AT:   130 Mississippi Avenue                  )
               Crystal City, MO 63019                      )
                                                                    )

**BRITTANY MEYER, Dispatcher, Individually,** )
SERVE AT:   130 Mississippi Avenue )
             Crystal City, MO 63019 )
              )
**GREG MAGUIRE, EMT, Individually,** )
SERVE AT:   1235 North Truman Blvd. )
             Crystal City, MO 63019 )
              )
**ANDY DIXON, EMT, Individually,** )
SERVE AT:   1235 North Truman Blvd. )
             Crystal City, MO 63019 )
              )
           Defendants. )

## COMPLAINT

### I.   NATURE OF THE ACTION

This action involves the intentional, wanton and malicious denial of medical treatment by supervisors and employees of the Crystal City Police Department.   The decedent, Kimberly Kertz, was taken into custody at the Crystal City jail when officers knew she was withdrawing from an opiate addiction.   The reason they refused to provide medical care was payback.   Ms. Kertz had refused to act as a confidential informant for Defendant Detective Sergeant Edward Robinson, where the target of his operation was the father of Ms. Kertz' one (1) year old son. She had been used as Defendant Robinson's confidential informant for three (3) years prior to her death.   After her death, Defendant Robinson stated, without regret, "You only burn us once."

Ms. Kertz was in the Crystal City jail for just over forty-three (43) hours consistently. She was under constant video and audio surveillance by the dispatchers in the control room of the City jail.   They were supposed to be monitoring her for signs of medical distress.   In an after-death police report, they reported nothing unusual was observed.   On the video recording of Ms. Kertz' cell however, she can be observed yelling for help throughout; and exhibiting signs of serious medical distress such as involuntary muscle movements, chills, sweats, vomiting and

dehydration. All the named Crystal City Police Department employees were acting in concert. Ms. Kertz died while they watched it happen.

The EMT Defendants were called to examine Ms. Kertz seventeen (17) hours into her custody. They spent five (5) minutes and thirty (30) seconds total examining her. They performed an ECG and took her blood pressure. She was complaining of severe chest pains. In the audio recording of this exam, the EMTs state that her blood pressure is 170/100. In their written report, they falsely recorded it as 160/90. These Defendants were intentionally ignoring the obvious medical distress of Ms. Kertz, and the need for immediate professional medical care. It was a "wink and a nod" exam. Medically, Ms. Kertz' death was wholly preventable.

## II.  JURISDICTION AND VENUE

1. Counts I through VI of this action arise under the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over Counts I through VI pursuant to 28 U.S.C. § 1331.

2. Venue is proper before this Court pursuant to 28 U.S.C. § 1391, as the unlawful acts committed occurred in Jefferson County, State of Missouri.

## III. PARTIES

### *PLAINTIFFS*

3. Plaintiffs are the Estate of Kimberly Kertz, and Paula Kertz. Paula Kertz is the appointed personal representative of the Estate of Kimberly Kertz, and the biological mother of Kimberly Kertz. The Estate is filed in Jefferson County, Missouri, Case No.: 22JE-PR00557. Plaintiff Paula Kertz is a resident of Jefferson County, Missouri.

4. Decedent Kimberly Kertz died February 9, 2022, in Jefferson County, Missouri, while in the custody of the Crystal City Police Department. Plaintiff Paula Kertz brings this action pursuant to RSMo. § 537.080(1), as the biological mother of decedent and as a member of the class

of individuals who are authorized to file a wrongful death claim. Decedent Kimberly Kertz was unmarried and had three (3) children.

5.       Under Section 537.080(1), Kimberly Kertz is survived by the following individuals who are also authorized to bring a wrongful death claim: Dennis Kertz (father); Paula Kertz (mother); Shannon Kertz (daughter); L.G. (minor son); T.K. (minor son); and Kurt Kertz (brother). There are no other members of the class who are entitled to file a wrongful death action to recover for the death of decedent Kimberly Kertz.

6.       In accordance with RSMo. § 537.095, Plaintiff Paula Kertz has notified all the other class members of this lawsuit.

### *DEFENDANTS*

7.       Defendant Crystal City is a municipal and political subdivision of the State of Missouri, located in Jefferson County, Missouri. In its most recent census population in 2020, the City had 4,734 residents.

8.       Defendant Edward "Eddie" Robinson was at all times relevant herein employed as a Detective Sergeant with the Crystal City Police Department. His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law. He is sued in his individual capacity.

9.       Defendant Kyle Boyer was at all times relevant herein employed as a Sergeant with the Crystal City Police Department. His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law. He is sued in his individual capacity.

10.      Defendant James Link was at all times relevant herein employed as a Detective Sergeant with the Crystal City Police Department. His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law. He is sued in his individual capacity.

11.    Defendant Curtis Pullen was at all times relevant herein employed as an Officer with the Crystal City Police Department.  His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law.  He is sued in his individual capacity.

12.    Defendant Timothy Bennett was at all times relevant herein employed as an Officer with the Crystal City Police Department.  His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law.  He is sued in his individual capacity.

13.    Defendant Jeff Price was at all times relevant herein employed as a Dispatcher with the Crystal City Police Department.  His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law.  He is sued in her individual capacity.

14.    Defendant Kristina Long was at all times relevant herein employed as a Dispatcher with the Crystal City Police Department.  Her actions taken as set forth in this Complaint were in the scope and course of her employment, and under color of law.  She is sued in her individual capacity.

15.    Defendant Kathy Forester was at all times relevant herein employed as a Dispatcher with the Crystal City Police Department.  Her actions taken as set forth in this Complaint were in the scope and course of her employment, and under color of law.  She is sued in her individual capacity.

16.    Defendant Brittany Meyer was at all times relevant herein employed as a Dispatcher with the Crystal City Police Department.  Her actions taken as set forth in this Complaint were in the scope and course of her employment, and under color of law.  She is sued in her individual capacity.

17.     Defendant Greg Maguire was at all times relevant herein employed as an EMT with the Joachim-Plattin Ambulance District, a political subdivision located in Jefferson County, Missouri.  His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law.  He is sued in his individual capacity.

18.     Defendant Andy Dixon was at all times relevant herein employed as an EMT with the Joachim-Plattin Ambulance District, a political subdivision located in Jefferson County, Missouri.  His actions taken as set forth in this Complaint were in the scope and course of his employment, and under color of law.  He is sued in his individual capacity.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Kimberly Kertz' Cause Of Addiction And Her Experiences With It

19.     At the time of Kimberly's death, she had been addicted to opiates for twenty (20) years.

20.     Kimberly gave birth to her first child when she was 19-years old.  She was prescribed narcotic pain medication after a complicated cesarean section surgery to deliver her daughter.  She quickly became addicted to the prescription pain killers and when she could no longer obtain the narcotics by prescription, her addiction led her to illegal, but accessible opiates, like heroin, which served as a replacement.

21.     Kimberly struggled with addiction for the next twenty years of her life but still managed to complete her vocational training to become a hairdresser.  She always strived to do better and wanted to provide for herself and her children.  She had committed to detox several times but without access to public (or affordable), long-term addiction treatment, she fell back into the vicious cycle that is opiate addiction.

22.    In December 2021, Kimberly reported to a local emergency room for opiate withdrawal symptoms, and was treated with IV fluids for dehydration, and suboxone (to lessen the withdrawal symptoms).

23.    Kimberly, because of her prior experiences with withdrawal, knew what were normal physical symptoms.  On the day prior to her death, EMT Defendants MaGuire and Dixon specifically asked her:

"EMS:  What's going on?
Ms. Kertz:  **My chest is hurting.**
EMS:  Where does it hurt at?
Ms. Kertz:  **All over**.
EMS:  What's it feel like?
Ms. Kertz:  **It's sharp**.
EMS:  When you cough does it make it worse?
Mrs. Kertz:  **Yes.**
EMS:  When you breathe in deep does that make it worse?
Ms. Kertz:  **Yes.**
EMS:  Anything seem to make it better?
Ms. Kertz:  **No.**
EMS:  How long has it been there?
Ms. Kertz:  **Just today.**
EMS:  Would you say:  since this morning when you woke up?
Ms. Kertz:  **Yes.**
EMS:  Gonna take some vitals signs on you…O.K.?
EMS:  Do you use?
Ms. Kertz:  **Yes.**
EMS:  What's your drug of choice?
Ms. Kertz:  **Heroin.**
EMS:  When's the last time you had any?
Ms. Kertz:  **Two days ago**."

"EMS:  Have you withdrawn before?  Does this feel similar to that?
Ms. Kertz:  **This is worse**."

EMT MaGuire to EMT Dixon:  "Did you get anything?
EMT Dixon responded:  **"A hundred seventy over a hundred."**

24.    Opiate withdrawal is not a death sentence, if treated by medical professionals. Kimberly's death was only caused because she was denied professional medical care.  Mercy Hospital Jefferson is only 2.6 miles from the Crystal City jail, and on a highway.

**B.     The Confidential Informant Relationship**

25.     Kimberly Kertz died on February 9, 2022, at the age of thirty-nine (39), in the custody of the Crystal City Police Department.

26.     On February 14, 2022, her parents went to the Crystal City Police Department to retrieve Kimberly's personal belongings.  They met with Defendant Detective Sergeant Robinson.

27.     Defendant Robinson explained to Kimberly's parents that he had known her from high school, and had been "working with Kim for three (3) years".  Kimberly's father responded, "We know.  And Kimberly said she didn't want to."  Robinson responded, "Well, you only burn us once."

28.     In an after-death report written by Defendant Robinson, he specifically denied and strangely mentioned that Kimberly Kertz was not a confidential informant.  For some unapparent reason, he felt the need to distance himself.  Despite that, he had admitted to Kimberly's parents that he used her as a confidential informant; he had shown up at her work sites to speak to her about it; and, knew full well who she was in text exchanges.

29.     On January 15, 2020, Kimberly's mother's personal cell phone reflects a text message exchange between Kimberly's mother and Defendant Robinson.  Kimberly was about to give birth to her youngest son, and would not be able to appear with Defendant Robinson for a court hearing:



30.     After the birth, Defendant Robinson wanted Kimberly to act as a confidential informant to apprehend another individual in an on-going investigation.  The individual was the father of Kimberly's son.

31.     Kimberly refused to cooperate or assist in any way, angering Defendant Robinson. This was the predicate for how she would be treated when taken into custody, and held until her death, on February 9, 2022.

### C.     The Crystal City Jail, And Kimberly Kertz' Arrival When Officers Knew She Was Unfit For Confinement And In Need Of Medical Attention

32.     The Crystal City jail is located inside the City Hall building along with the Crystal City Police Department.  The entire City population is 4,734.

33.     On information and belief, the City's jail has between four to six small jail cells, several of which are routinely used for storage.

34.     The Crystal City jail is designed only as a short-term holding facility and is not equipped to treat detainees that require medical attention.  Further, the City employs no one to render emergency medical attention to detainees.

35.     The Crystal City Police Department does maintain a "Policy for Inmate Intake, Custody, and Release."  The Policy dictates that officers shall determine whether an arrestee has a medical condition or emergency health condition that would render them unfit for confinement prior to being booked in the jail.

36.     Despite this policy, and notice from the City of Pevely officers that Kimberly was experiencing "flu-like" symptoms, and had admitted to consuming opiates just prior to her arrest on February 7, 2022, Crystal City Police Department's knowledge that Kimberly was undergoing forced, rapid-detoxification from heroin after prolonged daily use, neither Officer Pullen nor

Sergeant Boyer transported Kimberly to the local hospital to determine whether she was ""Fit for Confinement"".

37.    Neither Officer Pullen, nor Sergeant Boyer, took any action to determine whether Kimberly could be safely detained at the Crystal City jail given her medical condition and the jail's lack of *any* on-site medical staff or resources.

38.    Further, despite his knowledge of the circumstances, Sergeant Boyer failed to properly instruct Officer Pullen to insure that he determined whether Kimberly was ""Fit for Confinement"" from a medical facility prior to booking her into the Crystal City jail in the early morning hours of February 8th.

39.    Sergeant Boyer and Officer Pullen each acted in violation of written Crystal City Police Department jail policy and with deliberate indifference when they failed to determine the seriousness and extent of Kimberly's medical condition and whether Kimberly could be safely confined in the Crystal City jail given the lack of access to on-site medical assessment, treatment, and nursing care.

40.    Despite the inability to provide on-site medical attention to detainees, Crystal City failed to implement policies or procedures to assess and screen inmates for common risks that if present, would pose, namely and specifically, a "Withdrawal Protocol".

41.    Crystal City Police Department's "Intake and Custody Policy" does not provide arrestees with assessments or screening to incoming arrestees or detainees for illness, medical conditions, communicable diseases, alcohol or opiate withdrawal, or suicide risk prior to or at the time of booking, vital signs of inmates who become unwell or present a potentially serious medical risk.

42.    Crystal City does not have on-site healthcare available for inmates.

43.    Instead, Crystal City Police Department's policy simply states that inmates who complain of sickness (or injury) are to be transferred to the nearby medical center for evaluation.

44.    Each Defendant named in this Complaint is individually guilty of at least one direct violation of this Crystal City Police Department's policy; and collectively, Crystal City Police Department officers and jail staff violated said policy on at least nineteen (19) specific occasions.

45.    Despite Kimberly's ongoing complaints and clear physical manifestations of a serious medical condition that continued to worsen over a period of nearly 44-hours, Kimberly was never transported to the hospital for evaluation per Crystal City Police Department's jail policy nor was she provided *any* type of medical care in light of her obvious need for assistance.

46.    The jail cell does not have any type of "call button" or any other mechanism by which an inmate can directly request assistance.  Instead, Crystal City Police Department's policy states that inmates are to be advised that they are monitored by video and audio, and are to communicate their needs to the dispatcher through the camera surveillance system.  Kimberly tried this numerous times, but no one was acting in good faith to her distress.

47.    Crystal City jail policies and procedures do not have a mechanism for tracking or documenting the fact that an inmate has been unable or unwilling to eat for a period of time, which could be important information in some situations, including situations like Kimberly's where she is experiencing an acute medical condition that may be associated with opiate withdraw and involves constant diarrhea and vomiting.

48.    A small sink that is combined with the toilet fixture is Kimberly only access to water and hydration.  She is not provided a cup and must position her mouth in the small space under the faucet to obtain a drink of water.

**D.    The Opioid "Withdrawal Protocol" Policy And Training That Does Not Exist In The Crystal City Police Department**

49.    A disproportionate number of people in jails have a substance use disorder.

50.    When an individual becomes tolerant and dependent on an opioid substance such as heroin or fentanyl, suddenly stopping use of the narcotic can cause withdrawal.

51.    Opiate withdrawal can consist of different symptoms at varying severities.  While there are common symptoms in opioid withdrawal, individual experiences can vary depending on the type of opioid they use, how much they use and the frequency with which they use. Individual factors like the person's health and metabolism can also play a part in the severity of the withdrawal.

52.    Death from opiate withdrawal is preventable, but untreated opiate withdrawal can lead to needless suffering or death, especially in a jail setting when the individual is at the mercy of jail staff for medical observation, care and treatment.

53.    According to the National Commission on Correctional Healthcare, "all correctional facilities, regardless of size, should have a system for screening, diagnosis, and appropriate treatment of alcohol and opioid withdrawal."

54.    In 2015, seven (7) years before Ms. Kertz's death, the National Commission on Correctional Healthcare published a guide for jails  recognizing that the implementation of opiate withdrawal protocols are necessary to the health and safety of inmates and that withdrawal protocols and training can prevent needless suffering and deaths that can result from untreated opioid withdrawal.

55.    The guide states that all staff should have basic knowledge regarding the course of substance disorders and the availability of effective treatment "even if such treatment is not available at the facility."  Further, the report states that all staff should be trained to recognize the

signs and symptoms of opioid withdrawal and be aware of the consequences of inadequate treatment, including death.

56.     The Clinical Opiate Withdrawal Scale (COWS) is a widely used screening and assessment tool available at no cost to agencies and requires minimal training to effectively implement. COWS is an 11-item scale used to identify common signs and symptoms of opiate withdrawal and to monitor the symptoms over time. The instrument is available at no cost from the National Institute of Drug Abuse (NIDA)

57.     Crystal City Police Chief Helms, Captain Pruneau and the City of Crystal City knew in February 2022 that failure to implement a policy, procedure and custom for screening, assessment and observation of inmates exhibiting signs of severe opiate withdrawal and dehydration would create a direct and distinct risk of harm, needless suffering or death to individuals in their custody, care and control.

### E.    Kimberly Kertz' First Twenty-Four Hours In Custody

58.     Kimberly Kertz arrived at the Crystal City jail at approximately 12:00 a.m. on February 8, 2022.  When she arrived, neither Officer Pullen, nor Sergeant Boyer, took any action to determine whether Kimberly could be safely detained at the Crystal City jail, given her medical condition and the jail's lack of *any* on-site medical staff or resources.

59.     Further, despite his knowledge of the circumstances, Sergeant Boyer failed to properly supervise Officer Pullen to ensure that he determined whether Kimberly was "Fit for Confinement" prior to booking her into the Crystal City jail in the early morning hours of February 8th.

60.     Ms. Kertz was booked into the Crystal City jail without any medical assessment and without an opiate withdrawal assessment and placed alone in Cell 4 shortly after midnight on Tuesday, February 8, 2022.

61.     Sergeant Boyer and Officer Pullen each acted in violation of written Crystal City Police Department jail policy and with deliberate indifference when they failed to determine the seriousness and extent of Kimberly's medical condition and whether Kimberly could be safely confined in the Crystal City jail given the lack of access to on-site medical assessment, treatment, and nursing care.

62.     At approximately 7:07 a.m. on February 8th, Officer Tyler Griffin enters Ms. Kertz cell with a breakfast sandwich and appears to converse briefly with Ms. Kertz before leaving the cell and taking the breakfast sandwich with him.

63.     By approximately 9:00 a.m., the Cell 4 video recording shows Ms. Kertz experiencing involuntary twitches and muscle movements.

64.     At approximately the noon hour on February 8th, Ms. Kertz is observed on the video, lying in a fetal position on the bed when a Crystal City Police Department Officer enters Ms. Kertz cell with lunch sandwiches, which he leaves on the sink inside the cell.

65.     Over the next several hours, Ms. Kertz can be observed on the video tossing and turning and repositioning herself and experiencing more pronounced involuntary muscle movements and body twitches.

66.     At approximately 5:00 p.m., Ms. Kertz gets up to use the toilet inside her cell. The video shows her motor functions are visibly deteriorating and shows her struggle to pull her one-piece jumpsuit back up.  Ms. Kertz can be seen on the video struggling to balance herself and she nearly falling over as she tried to lay back down on the plastic mattress which she had then position on the floor.

67.     The Crystal City jail cells are not equipped with any type of "call button" or any mechanism by which an inmate can directly request assistance or direct the attention of jail staff. Instead, Crystal City Police Department policy states that inmates are to be advised that they are

monitored by video and audio are to communicate their needs to the dispatcher through the camera surveillance system.

68.     At approximately 5:09 p.m., Ms. Kertz looks up, directly at the camera and says "Help."

69.     Approximately five (5) minutes later, Ms. Kertz gets up and tries to get a drink of water from the faucet that is attached to the toilet in her cell.

70.     At no time throughout Ms. Kertz' incarceration did Crystal City provide Ms. Kertz with a cup or any way for her to obtain a substantial drink of water or to consume an appropriate amount of fluids.

71.     Approximately twenty (20) minutes later, Ms. Kertz grabs a roll of toilet paper and throws it directly at the camera and looks directly at the camera.

72.     At approximately 6:19 p.m., Officer Pullen enters Ms. Kertz cell with a food tray. He can be seen trying multiple times to flush the toilet.  He leaves a new sandwich for Ms. Kertz on the sink and exits the cell with the lunch sandwich that Ms. Kertz did not eat.

73.     Approximately twenty (20) minutes later, Ms. Kertz stands up, walks to the cell door and yells "HELP!"

74.     Twenty (20) minutes later an officer enters the cell, attempts to flush the toilet and appears to speak with Ms. Kertz.  He then leaves the cell with the uneaten sandwich, which is the third meal that Ms. Kertz did not eat.

75.     The video shows that Ms. Kertz asked for help and tried to obtain the attention of the dispatch officers in the control room at least eight (8) times, not including the conversations she had with officers that entered her cell, before EMS were called to the jail for her.

**F.    Kimberly's JPAD Assessment In The Presence Of Defendant Link And Defendant Pullen**

76.    Joachim Plattin Ambulance District EMTs Greg McGuire and Andy Dixon responded to the Crystal City jail to evaluate Kimberly, per her request, at approximately 7:30 p.m. on February 8, 2022.

77.    The assessment took place in the booking room and was recorded, with audio, by Crystal City Police Department video surveillance.  Both Defendant Sergeant James Link and Defendant Officer Pullen were present for the assessment.

78.    The video begins with Officer Pullen apologizing to JPAD EMTs McGuire and Dixon for making them respond to the jail to assess Kimberly's medical condition.

79.    In the video, Defendant Pullen escorts the EMTs to the booking room and says, "Sorry," first to EMT McGuire; and then he says, "Sorry," to EMT Dixon. He then apologizes, again, to both and says, "Just my personal apologies . . . [inaudible]."

80.    Defendant Sergeant James Link then proceeds to tell the JPAD EMTs, "She said, when she got arrested, she thought she might be "Covid.""  Link can be seen using his hands to make air-quotation marks as he relayed Kimberly's statements describing her medical complaints to the EMTs.  EMT Dixon visibly smirked in response to Link's description of Kimberly's medical complaints.

81.    Sergeant Link continued explaining the background information as follows: "She got arrested in Herky last night, so she's been here twenty-four hours . . . Truth is, **she's just Dope Sick**."  EMT Dixon smiled again and shook his head affirmatively, signaling his agreement with Sergeant Links' personal and unqualified opinion of Kimberly's medical condition before Kimberly even entered the room for evaluation.

82.    At approximately 7:43 p.m., Officer Pullen escorting Kimberly into the booking room where she is met by Sergeant Link, EMT McGuire and EMT Dixon.

83.    As Kimberly enters the room, walking very slowly, with her hand grasping her jail-issued jumpsuit near her chest area. EMT McGuire asks Kimberly what's going on and Kimberly says, "[m]y chest is hurting *worse*."

84.    Kimberly tells the EMTs that the chest paid is sharp and that it "hurt all over." Kimberly could not say when exactly the pain started but did agree with EMT McGuire when he asked if she had been experiencing the chest pain since she woke up earlier that day.

85.    Kimberly's demeanor was quiet but cooperative.  She appeared to be staring off into the distance and at times was inadvertently rocking herself.  She also appeared to yawn excessively throughout the assessment, which is a common sign and symptom of opiate withdrawal.

86.    Kimberly told the JPAD EMTs that she was a daily user of heroin.  EMT McGuire observed marks on her arms from intravenous drug use and Kimberly told him that she used to do inject heroin but for the past year, she has been snorting or ingesting instead, thereby putting both CCPD officers and JPAD EMTs on notice that she not only used heroin on a daily basis, but that she had been actively using heroin every day for multiple years.

87.    EMT McGuire conducted an ECG on Kimberly, while EMT Dixon obtained her blood pressure reading.

88.    McGuire can be heard telling Kimberly she has to stay still so he can get the ECG reading.

89.    A few seconds later, EMT McGuire tells Kimberly, "[e]verything looks good on your heart, okay?"  He immediately goes on to say, "[m]aybe it's just . . ." . . . but stopped himself short and instead asked, "…is your stomach bothering you?"  Kimberly shook her head yes.

90.     EMT  Dixon is then heard saying that Kimberly's blood pressure is "one-seventy over one hundred," however, a copy of the JPAD run report shows that the EMT s falsely documented Kimberly's blood pressure as 160/90 in the official record.

91.     EMT Mcguire tells Kimberly, "[t]his is probably because you haven't had any heroin… it's a good chance because,  . . . you just have a lot of the symptoms, okay?"

92.     EMT McGuire then asks Kimberly if she has ever withdrawn for heroin before and Kimberly shakes her head, 'yes,' affirming that she had withdrawn before.

93.     McGuire asks Kimberly if what she is experiencing felt like heroin withdrawal, and Kimberly shook her head 'no' and unequivocally told EMT  McGuire, "***This is worse.***"

94.     McGuire responded, "Well, doesn't make things any better being in a jail where you can't move around and at least …[inaudible] . . . it only makes things worse. . . Okay?  Your vital signs are stable. Your blood pressure is up a little bit, which doesn't surprise me. . . ." and almost in the same breath, McGuire turned to Sergeant Link and Officer Pullen and said, "She checks out alright . . . Okay?"

95.     McGuire pauses and makes direct and apparently intentional eye-contact, first with Officer Pullen, and then with Sergeant Link, and says to them, "You good with that?" Sergeant Link responds, "Yeah, I'm good with that."

96.     Kimberly stands up and begins to walk out of the booking room toward her cell. The EMTs stop her because she still has the ECG pads attached to her legs.  As Kimberly attempts to bend down to remove the pads, she loses her balance and nearly falls down.  Officer Pullen can be seen reaching out to assist her but Kimberly grabs the door frame and is able to regain her footing.

97.     After Kimberly exited the booking room, Sergeant Link says to EMT McGuire, "If she continues to act up, I'll just take her to the hospital later."

98.    EMT McGuire responds, "Oh yeah, you might have to… uh, for a fit for confinement, just for your own piece of mind… Like I said before, it's a pretty good chance that it's just because she hasn't had anything . . . So how many years until you're retired?"  Sergeant Link quickly says, "I'm thinking anytime between tomorrow and the next two years," and McGuire laughs and says, "I'm the same way.  I'm about like that.  Yep."

99.    Kimberly's medical assessment ends with the Crystal City Police Department and JPAD personnel discussing retirement and how long their employers will continue paying their medical insurance after they retire.

### G.    JPAD And CCPD Officer Pullen And Sergeant Link Conspired To Delay And Ultimately Deny Kimberly Access To Medical Care Despite Their Knowledge Of Her Serious Medical Condition And The Risk Posed To Her Health, Safety And Wellbeing

100.    JPAD EMTs McGuire and Dixon did not recommend that Kimberly be transported to the hospital for clinical evaluation of her chest pains, Stage Two Hypertension, and other symptoms that were consistent with severe Opiate Withdrawal Syndrome or another serious medical condition.

101.    JPAD EMTs McGuire and Dixon failed to fully document Kimberly's basic vital signs, including her heart rate and temperature, and incorrectly documented Kimberly's blood pressure on the run-report to reflect a lower, less concerning result.

102.    JPAD EMTs did not reassess Kimberly's blood pressure after fifteen (15) minutes in accordance with JPAD policies and standard EMS procedure.

103.    JPAD EMTs did not explain to Kimberly the risks associated with non-transport to the hospital for clinical evaluation of her potential and likely serious medical condition under the circumstances.

104.    Both JPAD EMTs violated JPAD policies by not obtaining a signed refusal or transport waiver from Kimberly when their service call did not result in transporting the patient to a higher level of care.

105.    Although JPAD EMTs told Sergeant Link that he will likely want to take Kimberly to the hospital for an evaluation or to at least obtain a fit for confinement determination if her symptoms persisted, JPAD did not advise Kimberly that she should receive a higher level of care if her symptoms persisted or worsened.

106.    Both JPAD EMTs McGuire and Dixon have been employed by JPAD for over a decade and are intimately familiar with the lack of on-site medical capabilities at the Crystal City jail; yet despite this awareness, McGuire and Dixon failed to transport Kimberly to the hospital, failed to recommend transport for Kimberly's chest pains and obvious signs of a serious medical need that should be clinically evaluated, and left Kimberly in a situation where they knew she would not have access to urgent or emergent medical assistance if she experienced an acute cardiac event consistent with her complaints and the symptoms they personally observed her to be experiencing.

107.    Officer Pullens' repeated apologies to McGuire and Dixon, combined with McGuire's questionable statement to both Link and Pullen to signal the conclusion of JPAD's medical assessment and their refusal to transport Kimberly –"Are you good with that"— and Pullen and Link's affirmative response; followed by Sergeant Link's statement that he "would take Kimberly later by car" if she continued to act up, when taken together, indicates that Crystal City Police Department and JPAD officers conspired together to prevent or otherwise delay Kimberly's access to medical care despite her obvious and sufficiently clear serious medical condition under the circumstances.

108.    Officer Pullen and Sergeant Link's failure to have Kimberly transported to Jefferson Regional Medical Center, either by police car or ambulance, given her medical complaints and visible symptoms was a clear violation of Crystal City's jail policy for sick or injured inmates.

109.    Both EMTs McGuire and Dixon likewise violated JPAD's policies by not transporting Kimberly under the circumstances and not obtaining a signature on a waiver or refusal form when they did no transport her to a higher level of care.

110.    Sergeant Link's comment that he would "take her later by car" further indicates Link's objective knowledge of the seriousness of Kimberly's medical condition and his deliberate indifference to Kimberly's health, safety and well-being by delaying, and ultimately denying Kimberly her right to medical care.

111.    Further, the facts present no evidence that there was a safety or staffing concern or other penalogical justification for denying or otherwise delay Kimberly's access to medical care for her serious health condition.

112.    After Officer Pullen Sergant Link, Paramdic McGuire and EMT  Dixon denied her access to clinical evaluation and treatment, Officer Pullen escorted Kimberly back to Cell #4 where she would needlessly suffer throughout the night and following day and then die almost exactly 24 hours later.

**H.    February 9, 2022: Kimberly's Last Hours Alive**

113.    Defendants Sergeant Link and Officer Pullen were both on notice of that Ms. Kertz was actively withdrawing from daily opiate use as well as Kimberly's medical condition, complaints of chest pains and elevated blood pressure.

114.    Defendant Officer Pullen was also aware that Ms. Kertz had not eaten at least two of the three meals served to her since she was taken into custody.

115.   Defendant Sergeant Link specifically verbalized his awareness, duty, and perhaps his concern as to Ms. Kertz medical condition when he told the EMTs that he would take Ms. Kertz by car if she continued to complain about her symptoms.

116.   Despite their knowledge of Ms. Kertz volatile medical condition, neither Defendant Sergeant Link, nor Officer Pullen physically checked on Ms. Kertz again throughout the remainder of their shifts.

117.   At approximately 2:20am and 2:36am on the morning of Wednesday, February 9th, the video shows Ms. Kertz hit the window of the cell door and waived her arms at the camera for help.

118.   Defendant Jeff Price was the dispatcher on duty at this time and failed to summon medical attention for Ms. Kertz despite her obvious pleas for help.

119.   At approximately 6:00 a.m. on Wednesday, February 9, 2022, incoming officers were advised by Defendants Sergeant Link and Officer Pullen that Ms. Kertz was being held in Cell 4, that Ms. Kertz was a daily user of heroin and was and was going on two days without using, causing her to withdraw from the narcotic. Officers were further put on notice that Joachim-Plattin Ambulance District EMTs responded to the jail the previous night to check on Ms. Kertz because she was experiencing severe chest pains.

120.   Throughout the morning hours, Ms. Kertz is seen on the video constantly tossing and turning, curling up under the blanket and then kicking it off of her as though she was experiencing revolving episodes of chills and sweats.

121.   At approximately 10:16 a.m., Ms. Kertz gets up to use the toilet for an extended period of time.

122.    She tries to get a drink of the faucet, but again, has no cup or other way to obtain an adequate drink. She cannot cup her hands together to get a substantial amount of water to drink because she must use one hand to hold down the faucet to make the water come out.

123.    She can be seen attempting to get an adequate drink of water from the faucet several times throughout the morning to no avail.

124.    At approximately 1:00 p.m., Ms. Kertz is lying on the floor of the cell when Defendant Officer Anthony Sottung enters.

125.    Officer Sottung makes no attempts to observe the severity of Ms. Kertz rapidly deteriorating medical condition.  He is in the cell for less than twenty (20) seconds and leaves a sandwich on the sink for Ms. Kertz.

126.     Around 1:35 p.m., Ms. Kertz sits up and vomits in the toilet so violently that she can barely breathe once the vomiting stopped.

127.    At 1:36 p.m., Ms. Kertz sits up and vomits again. Her breathing is labored as she wipes the vomit from her face onto her jail issued blanket.

128.    At 1:37 p.m., Ms. Kertz sits up and vomits again. Her breathing is labored as she wipes the vomit from her face onto her jail issued blanket.

129.    Ms. Kertz appears to ask for help as she lays back down on the cell floor.  Her mouth is visible parched, showing obvious signs of dehydration.

130.    At 1:40 p.m. Ms. Kertz sits up and vomits again. She lays back down.

131.    At 1:41 p.m. Ms. Kertz sits up and vomits again.

132.    At 1:42 p.m. Ms. Kertz sits up and vomits again. She lays back down.

133.    At 2:04 p.m. Ms. Kertz sits up and vomits again.

134.    At 2:09 p.m. Ms. Kertz sits up and vomits again. She lays back down.

135.    At 2:11 p.m. Ms. Kertz sits up and vomits again. She lays back down.

136.    At 2:33 p.m. Ms. Kertz sits up and tries to get a drink of water from the sink and then lays back down.

137.    At 2:49 p.m. Ms. Kertz sits up and vomits again and then lays back down.

138.    At 2:50 p.m. Ms. Kertz sits up and vomits again—A Lot. She lays back down.

139.    At 2:51 p.m. Ms. Kertz sits up and vomits again.

140.    Ms. Kertz continues to vomit, dry heave, and ask for help over the next hours and is seen curled up and rocking herself back and forth, as she lays in a fetal position on the cell floor.

140.    The video shows that Ms. Kertz is suffering in obvious mental and physical distress and is in a visibly weakened physical state.

141.    Ms. Kertz is observed talking while looking directly at the camera throughout this period of time.

142.    At 4:51 Ms. Kertz vomits again.

143.    Over an approximately five hour period, Ms. Kertz vomited, repeatedly, at least twenty-four times.

144.    Defendants Crystal City Dispatchers Kathy Forrester and Brittany Meyer were both on duty throughout the day of February 9, 2022, and required by Crystal City Jail Policy to monitor Ms. Kertz from the control room via the Cell 4 camera by both video and audio.

145.    Neither Defendant Forrester nor Meyer obtained medical assistance for Ms. Kertz or otherwise offered aid to Ms. Kertz despite Ms. Kertz suffering a clear and obvious serious medical condition.

**I.    Officer Bennett Finds Ms. Kertz On The Floor Of Her Cell And Too Ill To Walk To The Courtroom To See The Judge**

146.    At approximately 5:30 p.m. Defendant Officer Timothy Bennett opens the cell door and observes Ms. Kertz lying on the floor.

147.    Defendant Officer Bennett tells Ms. Kertz that she needs to get up and walk with him to the courtroom to see the judge but Ms. Kertz told the officer she was too sick to go to court and could not get up.

148.    Defendant Officer Bennett advised Ms. Kertz that the judge was waiting for her and that she could possibly get released from custody when she sees him, but Ms. Kertz continued to tell the officer that she was too sick go.

149.    Defendant Officer Bennett advised Ms. Kertz that she would have to stay in jail until the next time the judge comes back if she didn't get up and to to court at that time—but Ms. Kertz again told Defendant Officer Bennett that she was too sick to get up and go before the judge.

### J.    Officer Bennett Informs The Court And Sergeant Boyer That Ms. Kertz Is Too Ill To Walk To Court

150.    Defendant Officer Bennett leaves Ms. Kertz on the floor of her cell and walks down the hall to the courtroom to inform Sergeant Boyer that Ms. Kertz has been vomiting and is too ill to get up and appear before the judge.

151.    Defendant Sergeant Boyer was conducting bailiff duties in the municipal courtroom when Officer Bennett informed him that Ms. Kertz was "Dope Sick" and withdrawing from heroin and was not able to be brought to court to see the judge.

152.    Defendant Sergeant Boyer was the supervising officer at this time and did not direct Defendant Officer Bennett to call an ambulance, to render any type of aid to Ms. Kertz, or to continue to closely monitor Ms. Kertz condition after learning that she had been vomiting and was too ill to appear in court.

153.    Defendant Sergeant Boyer did not physically check on Ms. Kertz to evaluate her medical condition and made no attempts to obtain medical assistance for Ms. Kertz after learning that Ms. Kertz was too ill to get off the floor of her cell and had been vomiting, despite his

knowledge and awareness that she was withdrawing from opiates, had been complaining of chest pains and vomiting over the past twenty-four hour period.

154.    Defendant Officer Bennett also failed to follow-up and check on Ms. Kertz to evaluate her medical condition and made no attempts to obtain medical assistance for Ms. Kertz after learning that Ms. Kertz was too ill to get off the floor of her cell and had been vomiting, despite his knowledge and awareness that she was withdrawing from opiates, had been complaining of chest pains and vomiting over the past twenty-four hour period.

155.    Defendant Sergeant Boyer reported that he passed on the information pertaining to Ms. Kertz to Sergeant Besore after court and then went off duty.

156.    No one from the jail or dispatch units checked on Ms. Kertz again over the next two hours.

157.    The Defendants all failed to monitor Ms. Kertz serious and rapidly deteriorating medical condition and left Ms. Kertz alone on the floor of her cell without medical assistance.

158.    At approximately 6:28 p.m., Ms. Kertz can be seen on video crawling to the sink to get a drink of water.  She is too weak to stand and tries to reach the faucet from her knees.

159.    At 7:07 p.m. Ms. Kertz sits up and vomits again.  She lays back down but then quickly sits back up and projectile vomits again.

160.    She appears visibly weak, pale and clammy and at times appears to be be saying "help" and "help me."

161.    Defendant Kristina Long was the Dispatcher on duty after 6:00 p.m. on February 9th, and was required to monitor Ms. Kertz in her cell from the control room video feed.

162.    Defendant Kristina Long failed to summons help for Ms. Kertz despite her repeated vomiting, her visually ill appearance, or Ms. Kertz' cries for help.

163.    At approximately 7:31 p.m. Ms. Kertz begins convulsing.  Ms. Kertz seizes for approximately two minutes and then she takes two big breaths and goes limp.

164.    Ms. Kertz is repositioned from the seizure so that her body is half way under the bed fixture that is attached to the cell wall.

165.    Despite her awkward and involuntary bodily position, she remains unnoticed by officers and dispatchers for approximately fifteen (15) minutes.

166.    Ms. Kertz is found unresponsive at approximately 7:48 p.m. when an officer enters her cell with a dinner tray.

167.    Ms. Kertz never regains consciousness, and lifesaving measures are futile.

## V.    CLAIMS

### Count I
### Monell Liability Against Defendant Crystal City
### Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and
### 42 U.S.C. § 1983

168.    Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

169.    At all times relevant to this Complaint, the Defendant Crystal City maintained a custom and practice of having no policy or protocol for confined citizens experiencing serious medical conditions.  The City employed no medically trained employees to assist in assessing medical care needs; designated no one to be a decision-maker in urgent situations at the jail; and, has maintained this custom and practice in the face of obvious needs and obvious violations of the Constitution which would result in the denial of healthcare.

170.    The failure to adopt, enforce, and maintain a policy to respond to medical emergencies of inmates resulted in a violation against Kimberly Kertz' Eighth Amendment rights to be free from cruel and unusual punishment, as protected by the Eighth Amendment.

171.    The typical, normal and routine custom, policy and practices of municipalities, specifically in the context of Kimberly Kertz' condition, is to adopt a "Withdrawal Protocol". On February 8, 2022, Kimberly Kertz had a blood pressure reading of 170/100, and, complaints of sharp and severe chest pain, which would have triggered a medical emergency under a "Withdrawal Protocol".

172.    The actions and inactions of Defendant Crystal City were deliberately indifferent to her Constitutional rights, and committed with reckless disregard of Kimberly's rights. The custom and practice of Defendant City was undeniably the moving force for the violation of her Eighth and Fourteenth Amendment rights.

173.    As a direct and proximate result of Defendant City's custom and practice, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

WHEREFORE, Plaintiffs pray for judgment against Defendant Crystal City for compensatory damages of $15,000,000.00, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

**Count II**
**Denial of Medical Care**
**Against Defendant Crystal City's Officers and Employees**
**(Edward Robinson, Kyle Boyer, James Link, Curtis Pullen,**
**Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer)**
**Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and**
**42 U.S.C. § 1983**

174.    Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

175.    At all times relevant to this Complaint, Kimberly Kertz possessed the Eighth Amendment Right to be free from cruel and unusual punishment in the denial of medical care while in the custody of the City of Crystal City jail, and the supervision and control of the individual

Defendants Edward Robinson, Kyle Boyer, James Link, Curtis Pullen, Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer.

176.    Each of the individual Defendants were aware on February 8 and February 9, 2022 that Kimberly Kertz was suffering from a serious, obvious medical condition.  With that knowledge, these Defendants were required to provide medical care to Kimberly Kertz by transporting her to a medical facility.

177.    Each of the individual Defendants failed and refused to transport Kimberly Kertz to a medical facility for treatment, resulting in the lost chance of survival for Kimberly Kertz.

178.    As a direct and proximate result of these Defendants' conduct, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

179.    The conduct of these Defendants was committed with deliberate indifference to, and reckless disregard to the Constitutional rights of Kimberly Kertz and her physical safety, thereby entitling Plaintiffs to punitive damages against each Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendants Edward Robinson, Kyle Boyer, James Link, Curtis Pullen, Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer, for compensatory damages of $15,000,000.00, punitive damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

**Count III**
**Conspiracy To Violate Kimberly Kertz' Civil Rights**
**Against Defendant Crystal City's Officers and Employees**
**(Edward Robinson, Kyle Boyer, James Link, Curtis Pullen,**
**Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer)**
**Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and**
**42 U.S.C. § 1983**

180. Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

181. At all times relevant to this Complaint, Kimberly Kertz possessed the Eighth Amendment Right to be free from cruel and unusual punishment in the denial of medical care while in the custody of the City of Crystal City jail, and the supervision and control of the individual Defendants Edward Robinson, Kyle Boyer, James Link, Curtis Pullen, Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer.

182. Each of the individual Defendants were aware on February 8 and February 9, 2022 that Kimberly Kertz was suffering from a serious, obvious medical condition. With that knowledge, these Defendants conspired together and reached a mutual understanding to withhold medical treatment from Kimberly Kertz, resulting in the lost chance of survival for Kimberly Kertz.

183. As a direct and proximate result of these Defendants' conspiracy, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

184. The conduct of these Defendants was committed with deliberate indifference to, and reckless disregard to the Constitutional rights of Kimberly Kertz and her physical safety, thereby entitling Plaintiffs to punitive damages against each Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendants Edward Robinson, Kyle Boyer, James Link, Curtis Pullen, Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer, for compensatory damages of $15,000,000.00, punitive damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

**Count IV**
**Failure to Intercede**
**Against Defendant Crystal City's Officers and Employees**
**(Edward Robinson, Kyle Boyer, James Link, Curtis Pullen,**
**Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer)**
**Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and**
**42 U.S.C. § 1983**

185.    Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

186.    Each of the individual Defendants were aware on February 8 and February 9, 2022 that Kimberly Kertz was suffering from a serious, obvious medical condition.  With that knowledge, each of these Defendants had the opportunity and means to prevent the violation of Kimberly Kertz' Eighth Amendment rights to medical care by contacting superiors within the Police Department to further prevent and stop her physical pain and suffering.

187.    Each of the individual Defendants consciously chose to turn a blind eye to Kimberly Kertz' suffering and remained silent, resulting in the lost chance of survival for Kimberly Kertz.

188.    As a direct and proximate result of these Defendants' conscious choice to do nothing and remained silent, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

189.    The conduct of these Defendants was committed with deliberate indifference to, and reckless disregard to the Constitutional rights of Kimberly Kertz and her physical safety, thereby entitling Plaintiffs to punitive damages against each Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendants Edward Robinson, Kyle Boyer, James Link, Curtis Pullen, Timothy Bennett, Jeff Price, Kristina Long, Kathy Forester, and Brittany Meyer, for compensatory damages of $15,000,000.00, punitive damages, attorney's fees

pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

**Count V**
**Denial of Medical Care**
**Against The EMT Defendants Greg MaGuire and Andy Dixon**
**Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and**
**42 U.S.C. § 1983**

190.    Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

191.    At all times relevant to this Complaint, Kimberly Kertz possessed the Eighth Amendment Right to be free from cruel and unusual punishment in the denial of medical care while in the custody of the City of Crystal City jail.

192.    Each of the individual Defendants became aware on February 8, 2022, that Kimberly Kertz was suffering from a serious, obvious medical condition.  Both Defendants were professionally aware that her blood pressure was 170/100, and complaints of severe acute chest pain.  As EMTs, and their training, their default response should have been to transport her to the local hospital for emergency treatment.

193.    Each of the individual Defendants failed and refused to transport Kimberly Kertz to a medical facility for treatment, resulting in the lost chance of survival for Kimberly Kertz.

194.    As a direct and proximate result of these Defendants' conduct, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

195.    The conduct of these Defendants was committed with deliberate indifference to, and reckless disregard to the Constitutional rights of Kimberly Kertz and her physical safety, thereby entitling Plaintiffs to punitive damages against each Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendants Greg MaGuire and Andy Dixon, for compensatory damages of $15,000,000.00, punitive damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

**Count VI**
**Conspiracy To Violate Kimberly Kertz' Civil Rights**
**Against The EMT Defendants Greg MaGuire and Andy Dixon**
**Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and**
**42 U.S.C. § 1983**

196.    Plaintiffs hereby incorporate by reference paragraphs 1 to 167, as though fully set forth herein.

197.    At all times relevant to this Complaint, Kimberly Kertz possessed the Eighth Amendment Right to be free from cruel and unusual punishment in the denial of medical care while in the custody of the City of Crystal City jail, and the supervision and control of the individual EMT Defendants Greg MaGuire and Andy Dixon.

198.    Each of the individual Defendants were aware on February 8, 2022 that Kimberly Kertz was suffering from a serious, obvious medical condition.  With that knowledge, these Defendants conspired together and reached a mutual understanding to withhold medical treatment from Kimberly Kertz, resulting in the lost chance of survival for Kimberly Kertz.

199.    As a direct and proximate result of these Defendants' conspiracy, Kimberly Kertz suffered excruciating physical pain, extreme emotional distress, and helplessness for over forty-three (43) hours until her death, on the floor, under the bed, of a jail cell.

200.    The conduct of these Defendants was committed with deliberate indifference to, and reckless disregard to the Constitutional rights of Kimberly Kertz and her physical safety, thereby entitling Plaintiffs to punitive damages against each Defendant.

WHEREFORE, Plaintiffs pray for judgment against the EMT Defendants Greg MaGuire and Andy Dixon, for compensatory damages of $15,000,000.00, punitive damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

Respectfully submitted,

THE BAGSBY LAW FIRM, LLC                LAW OFFICE OF KARIE PENNINGTON, LLC

/s/   Larry A. Bagsby                          /s/   Karie M. Pennington
Larry A. Bagsby, #37296                   Karie M. Pennington, #65692
119 South Main Street                        7095 Metropolitan Blvd., Suite D2
St. Charles, MO 63301                        Barnhart, MO 63012
(636) 244-5595 telephone               (314) 681-9000 telephone
larrybagsby@aol.com                        Karie@lawyerup314.com
*Counsel for Plaintiffs*                         *Co-Counsel for Plaintiffs*