UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| **THE ESTATE OF KIMBERLY KERTZ**, | ) | |
| and **PAULA KERTZ** | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No.:    25-CV-160  JSD |
| vs. | ) | |
| | ) | |
| **CITY OF CRYSTAL CITY, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFFS' NOTICE OF NEW, SUPPLEMENTAL AUTHORITY PERTAINING TO DEFENDANTS' SEPARATE MOTIONS TO DISMISS**

COME NOW, Plaintiffs, by and through counsel, and respectfully provides the Court and opposing counsel notice of an Opinion issued July 11, 2025, by the U.S. Court of Appeals for the Eighth Circuit, which directly addresses the issues raised by the pending Motions to Dismiss (Docs. 51 and 53), filed separately, on a claim of denial of medical care under the Fourteenth Amendment and 42 U.S.C. § 1983.   The case is *Troupe v. Young, et al.*, Opinion No. 24-1036.   (Attached hereto).  The Opinion was issued after all briefing on the motions to dismiss were submitted.

The Opinion in *Troupe* distinguishes a case relied upon by Defendants here, and the trial court in that case, *Jones v. Minnesota Department of Corrections*, 512 F.3d 478 (8th Cir. 2008). The Appellate Court in *Troupe* reversed the trial court's finding that the pretrial detainee did not, objectively, demonstrate a serious medical need, with symptoms identical to decedent Kimberly Kertz, and further, collected cases denying qualified immunity to officers based upon facts identical to Plaintiff Kimberly Kertz's conditions which were manifested.  (*Troupe* Opinion, pp. 14-18).  The Opinion further reversed the grant of qualified immunity at the pleadings stage.

Respectfully submitted,

THE BAGSBY LAW FIRM, LLC                    LAW OFFICE OF KARIE PENNINGTON, LLC

/s/    Larry A. Bagsby                        /s/    Karie M. Pennington

Larry A. Bagsby, #37296                       Karie M. Pennington, #65692
119 South Main Street                         7095 Metropolitan Blvd., Suite D2
St. Charles, MO  63301                        Barnhart, MO  63012
(636) 244-5595 telephone                      (314) 681-9000 telephone
larrybagsby@aol.com                           Karie@lawyerup314.com
*Counsel for Plaintiffs*                       *Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was mailed or served upon the following via this Court's e-filing system this 18th day of August, 2025, to:

Robert T. Plunkert
Pitzer Snodgrass, PC
100 S. Fourth Street, Suite 400
St. Louis, MO 63102-1821
*Attorney for Defendants Crystal City and the Individual Police*
*Officers of Crystal City*

Bryce G.Pfalzgraf
Steven H. Schwartz
Brown & James, PC
800 Market Street, 11th Floor
St. Louis, MO 63101
*Attorneys for Defendants Maguire and Dixon*

/s/    Larry A. Bagsby

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1036

_____

Tashonda Troupe, individually and, on behalf of Lamar Catchings, deceased

*Plaintiff - Appellant*

v.

Anthony Young, in his individual capacity

*Defendant*

St. Louis County, Missouri; Julia Murphy, in her individual and official capacities; Spring Schmidt, in her individual and official capacities; Emily Doucette, in her individual and official capacities; Dexter Swims, in his individual and official capacities; Justin Mohler, in his individual capacity; Daniel Morgan, in his individual capacity; Felicia Collins, in her individual capacity; Bryan Kirkbride, in his individual capacity; Monika Williams, in her individual capacity; Justin Anderson, in his individual capacity; Jordan Atwater, in his individual capacity; Lakeisha Walker, in her individual capacity

*Defendants - Appellees*

Unknown Ross, in his individual capacity; Unknown Jackson, in his individual capacity

*Defendant*s

Steven Drews, in his individual capacity; Nathaniel Beard, in his individual capacity; Rodrick Oliver, in his individual capacity

*Defendants - Appellees*

Terrianna Byas, in her individual capacity; Melissa Sussman, in her individual capacity

*Defendant*s

Unknown Doe Physician, in his/her individual capacity; John and Jane Doe Corrections Officers and Staff

*Defendants - Appellees*

————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————

Submitted: January 14, 2025
Filed: July 11, 2025

————————

Before SMITH, BENTON, and ERICKSON, Circuit Judges.

————————

SMITH, Circuit Judge.

Lamar Catchings, a 20-year-old pretrial detainee, died from treatable but undiagnosed acute leukemia while in custody at the St. Louis County Buzz Westfall Justice Center (Jail) in February 2019. His mother, Tashonda Troupe, filed this 42 U.S.C. § 1983 lawsuit against St. Louis County (County) and numerous jail officials, medical staff, and correctional officers, alleging that they were deliberately indifferent to her son's serious medical needs or failed to train or supervise the staff members responsible for his care. The district court dismissed the claims as to most of the defendants at the pleading stage. For the reasons explained below, we affirm in part and reverse in part.

## I. *Background*

Catchings was a pretrial detainee at the Jail between April 2018 and February 2019. Accepting the allegations in Troupe's second amended complaint (Complaint)

-2-

as true, Catchings was a healthy and active 19-year-old prior to his stay at the Jail. However, beginning in early February 2019, Catchings began to show "symptoms of illness, including but not limited to loss of appetite; vomiting; hearing loss; dizziness; and marked decrease in levels of physical activity." R. Doc. 29, at 17. This progressed to "difficulty in walking; . . . loss of appetite and missing of meals; frequent vomiting if and when he would attempt to eat"; "decreased mobility [that required] the assistance of corrections officers to rise to a standing position; need for a wheelchair . . .; extreme weakness rendering him almost exclusively confined to his bed and cell; dizziness; headaches; visible weight loss; almost complete anorexia and/or inability to eat; and frequent vomiting." *Id*. at 17–18.

Troupe alleged as to each defendant, "[o]n information and belief," that during the month of February 2019, they had observed or were aware of his "deteriorating health and physical condition" and "participated in internal discussions and communications regarding . . . his . . . physical condition." *Id*. at 37. These internal discussions allegedly led to adjustments to Catchings's living conditions, including (1) arranging for his meals to be brought to his cell rather than having him walk to the common meal area; (2) moving him to a cell on the lower floor because he was judged to be a fall risk on the stairs; and (3) tracking his movement out of his cell and his food intake.

During the second week of February 2019, Catchings spoke to an unnamed correctional officer to report that he was vomiting when he ate. Catchings told her that he was unable to walk to get a sick call form. The correctional officer delivered the sick call form to him. Catchings submitted the sick call form, and defendant Anthony Young, a practical nurse, responded several days later, on February 18. Catchings reported his symptoms to Young, including "headaches, dizziness, and hearing loss," and the unnamed correctional officer told Young about Catchings's vomiting, but Young recorded his symptoms as only a "headache." *Id*. at 23. Young discounted Catchings's vomiting, telling another correctional officer that he was "not vomiting blood nor was there any blood in his stool." *Id*. at 25.

-3-

According to Troupe, Young ignored several standing orders issued by the County's Department of Public Health, which oversaw jail detainees' medical care. These standing orders required Young to (1) accurately record Catchings's symptoms; (2) record Catchings's vital signs; (3) contact a medical provider for further orders if a detainee complains of headache combined with dizziness or weakness; and (4) comply with specific protocols when a detainee is reported as vomiting. Troupe alleged that Young failed to perform these required duties. Young spent seven minutes examining Catchings and ultimately prescribed him Tylenol.

Troupe also alleged that defendant Emily Doucette, as the codirector of the County's Department of Public Health, had a policy and practice to review the notes and records of interactions with detainees. Troupe asserts that Doucette failed to review Catchings's records and interactions of staff within the facility. Troupe states that if Doucette had reviewed Young's interaction records, she would have seen that Young only spent seven minutes with Catchings and failed to take his vital signs. Troupe alleged that Doucette was also aware that there was a "need to take remedial action" regarding previous jail deaths because it had been discussed by recent media reports, the St. Louis City Council, and internal reports. *Id*. at 53.

Catchings had a court appearance scheduled for February 22, 2019. Prior to the court appearance, Catchings reported to defendant Justin Mohler that he was feeling sick, as he was "weak, dizzy, . . . unable to stand[,] . . . [and] noticeably and visibly sick and vomiting." *Id*. at 26. Catchings's cell was on the second floor, so correctional officers carried him down the stairs, placed him in a wheelchair, and transported him to his court appearance. When he arrived back at the Jail after the court appearance, Catchings requested to go to the infirmary. Instead, defendant Terrianna Byas, a practical nurse like Young, examined Catchings in his cell. During the examination, Byas reported that Catchings said he had a headache. Troupe alleged that Catchings also told Byas that he was dizzy and vomiting. Troupe avers that Byas violated the same standing orders Young had neglected just days before. She alleged that Doucette failed to review the notes and records of Byas's cell visit also.

-4-

Sometime between February 23, 2019, and February 28, 2019, defendant Monika Williams provided Catchings with a sick call form because Catchings was still feeling unwell. Catchings told Williams, however, that "nothing was going to happen because neither of his previous two sick calls had resulted in him being able [to] visit . . . the infirmary or [be] examined by a medical doctor." *Id*. at 29.

On February 26, 2019, Young again examined Catchings in his cell. During this exam, Catchings reported that he "was dizzy, had been vomiting, was experiencing a burning sensation in his chest, and could not walk." *Id*. Mohler told Young that he had seen Catchings vomiting, and Young was able to examine the trash can to see that Catchings had vomited. Despite this, Young told Catchings that he was "'faking' and needed to 'stop this behavior.'" *Id*. at 30. After leaving the cell, Young told Mohler, "[t]here is nothing wrong with him. He is a f***ing faker." *Id*. In response, Mohler told Young that he needed to schedule Catchings to visit the clinic to see a registered nurse or medical doctor. Young told Mohler that he would.

Defendant Felicia Collins then authorized Mohler to move Catchings to a cell on the lower level due to concern Catchings might fall while using the stairs because of his inability to walk. Mohler and defendant Lakeisha Walker, another correctional officer, saw Catchings vomit while being moved from his cell. Catchings was never taken to the infirmary and was never seen by any other medical personnel before he died.

On February 28, 2019, at 2:05 p.m., Williams made her rounds through the cell block. Catchings did not stand. Williams investigated by knocking on his cell door. Catchings did not respond. Williams then contacted the floor Unit Control group for the cell block. This group included defendants Dexter Swims, Steven Drews, and Rodrick Oliver. Unit Control went to his cell door. Swims knocked. He and Catchings "had a short exchange of words," and then the Unit Control left without observing whether Catchings could stand. *Id*. at 36. Troup alleged that this violated the County's policy. According to Troupe, the County's policy required the defendants to make Catchings stand to properly assess his health and physical

condition. The Complaint alleged that defendant Julia Murphy, the director of the Jail, knew that correctional officers were continually failing to abide by this policy, along with the medical policies listed above, and failed to take any disciplinary action regarding that failure. Furthermore, Troupe alleged that Murphy's training and supervision failed to ensure that Jail staff knew that jail policy required assessment of detainee health by requiring them to stand.

At 4:05 p.m., other detainees heard Catchings yell from his cell, "I need to see a doctor!" *Id*. Later that night, at around 9:00 p.m., Williams attempted to speak to Catchings through his cell door. When Catchings did not respond, she did not enter his cell to check on him but rather walked away. Around 10:15 p.m., Williams did not make Catchings stand for the "sign of life" check. *Id*. at 37. Catchings died during the night. Jail staff discovered his body during morning rounds on March 1, 2019.

Postmortem examination determined that Catchings had died from acute leukemia. Troupe alleged that the condition is "easily treated and survivable if standard and recognized treatments for his condition had just been provided" and was "completely diagnosable through a routine blood panel administered by the jail." *Id*. at 8.

The Complaint listed the following as defendants: the County, 18 individuals currently or formerly employed by the County, as well as John and Jane Doe defendants. Troupe alleged that the defendants violated Catchings's civil rights under 42 U.S.C. § 1983. The defendants filed motions to dismiss, arguing that they were protected by qualified immunity or that Troupe failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).

The district court's analysis specifically noted that many of the allegations in the Complaint rested on "upon information and belief allegations." R. Doc. 70, at 21 (internal quotation marks omitted). As to each of the correctional officers—Swims,

Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Drews, Beard, and Oliver—Troupe alleged:

> 192. On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, [the] [d]efendant [correctional officer] personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

> 193. On information and belief, [the] [d]efendant [correctional officer] knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

> 194. On information and belief, [the] [d]efendant [correctional officer] was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

*See, e.g.*, R. Doc. 29, at 37. The district court concluded that these allegations were too "rote, generalized, [and] conclusory" and were "not supported by any factual allegations" to "be sufficient to state a claim." R. Doc. 70, at 21. Excluding these "upon information and belief" allegations, the district court found that the complaint lacked specific factual allegations as to all the defendants except for Young.

The district court dismissed claims against most defendants based on qualified immunity. The court concluded that because the Complaint lacked sufficient allegations that each defendant personally violated Catchings's constitutional rights, the defendants were entitled to qualified immunity. The district court found most defendants either (1) lacked actual knowledge of Catchings's serious medical condition; (2) reasonably relied on medical staff's assessments; or (3) did not personally participate in denying medical care.

The County avoided municipal liability because the district court determined that Troupe failed to state a claim showing entitlement to such relief. To hold the

-7-

County liable, Catchings would first have to establish individual liability on the underlying claim. The court concluded that only defendant "Young's actions [could] form the basis for municipal liability in this case," because it "concluded that the claims against the remaining defendants [were] subject to dismissal." *Id*. at 50–51. The district court found that there were "no well-pleaded facts that any of the County's alleged customs and/or policies were the moving force behind any constitutional violation by Young in this case." *Id*. at 51. The district court determined that Troupe's failure-to-train-or-supervise claim against the County suffered the same deficiency.

Thus, only Troupe's federal claim against Young survived the defendants' motions to dismiss. The district court did not rule on the state law claims, stating that it would "defer ruling on the state law claims pending the parties' decision to appeal the qualified immunity rulings in this Memorandum and Order." *Id*. at 2. It also decided to "stay the case for 60 days and deny the motions to dismiss the state law claims without prejudice to being refiled" to "afford the parties the opportunity to determine whether to appeal the qualified immunity rulings." *Id*. at 54. Neither party filed an interlocutory appeal.

Troupe instead filed a motion requesting relief from the order of dismissal, or, alternatively, for leave to conduct discovery. Discovery would enable her to replead her allegations with more particularity. She sought the court's leave to file an amended complaint stating the basis for her "upon information and belief" allegations. Alternatively, she sought the district court's certification of an interlocutory appeal for this court to determine whether her "upon information and belief" allegations were insufficient to overcome qualified immunity. The district court denied the motion, stating that she "had an immediate right to appeal the March 15, 2022 decision on qualified immunity and did not do so." R. Doc. 79, at 2. Further, the court stood by its previous analysis and denied Troupe's motion to reconsider its dismissal order. The district court also denied Troupe's request to amend her Complaint, as she "did not seek leave to amend [either] . . . the § 1983 claim against Young [or] the state law claims." *Id*.

-8-

The case continued through discovery as to the claim against Young. Young eventually moved for summary judgment, which the district court denied. Later, Troupe and Young settled.

## II. *Discussion*

Troupe then filed this appeal seeking reversal of the district court's dismissal of defendants Swims, Beard, Oliver, Mohler, Williams, Murphy, Doucette, and the County. Troupe argues that the district court erred in setting aside her "upon information and belief" allegations, relying on *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948 (8th Cir. 2023). She contends that if the district court were to accept these allegations as true, it would provide the necessary factual allegations to support a finding that the defendants were subjectively aware of Catchings's serious medical condition but, nonetheless, deliberately disregarded his need for medical care.

The defendants argue that the appeal is untimely, and even if it were timely, the district court did not err in deciding that they were entitled to qualified immunity or that Troupe had failed to state a claim, because Troupe's "numerous and self-serving 'on information and belief' conclusions were insufficient to establish a plausible basis for liability." County Appellees' Br. at 9.

## A. *Timeliness of the Appeal*

We first address whether Troupe's appeal is timely. "Although 28 U.S.C. § 1291 vests the courts of appeals with jurisdiction over appeals only from final decisions of the district courts, a decision *final* within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case." *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985) (emphasis added) (internal quotation marks omitted). The defendants concede that the "*denial* of a motion to dismiss a claim on the basis of qualified good-faith immunity is a final appealable decision within the meaning of 28 U.S.C. § 1291." *Taylor v. Carter*, 960 F.2d 763, 764 (8th Cir. 1992) (emphasis added).

-9-

The defendants contend that Troupe waived her right to appeal the district court's grant of qualified immunity by not immediately appealing. In the district court's order granting the defendants' motions to dismiss as to all parties except Young, it stated: "The [c]ourt will defer ruling on the state law claims pending the parties' decision to appeal the qualified immunity rulings in this Memorandum and Order." R. Doc. 70, at 2. Later, in ruling on Troupe's Motion for Relief, it stated:

> The [c]ourt then stayed the proceedings for a short time to permit plaintiff and/or Young the opportunity to appeal the adverse qualified immunity rulings to the Eighth Circuit Court of Appeals. Neither plaintiff nor Young exercised their right to appeal the qualified immunity rulings. . . . Plaintiff had an immediate right to appeal the March 15, 2022 decision on qualified immunity and did not do so.

R. Doc. 79, at 1–2. The district court cited *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009), for the proposition that "a district court's order rejecting or granting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of § 1291." R. Doc. 79, at 1 (internal quotation marks omitted). But *Iqbal* did not address whether the *grant* of qualified immunity was a ruling that would be immediately appealable as a final decision. *See Iqbal*, 556 U.S. at 672. *Iqbal* dealt with the application of the collateral order doctrine to a denial of qualified immunity in a court's ruling on a motion to dismiss. *Id.*

*Forsyth* involved the denial of qualified immunity, not its grant. 472 U.S. at 527. Rulings denying qualified immunity are final decisions within the meaning of § 1291 because "qualified immunity is in fact an entitlement not to stand trial under certain circumstances." *Id.* at 525. "[T]he district court's decision is effectively unreviewable on appeal from a final judgment." *Id.* at 527. The same reasoning does not apply to a district court's decision to grant qualified immunity to defendants.

The defendants rely on *Hope v. Klabal*, 457 F.3d 784 (8th Cir. 2006), for the argument that the district court's clear statement that Troupe had an immediate right to appeal made its decision final. *Hope*, though, is distinguishable. There, following

-10-

the summary judgment stage, only one claim remained. Rather than try the claim, the parties filed a stipulation to dismiss it without prejudice. *Id*. at 788. The court there stated that "[a] final decision requires some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as the court is concerned, is the end of the case." *Id*. at 789 (cleaned up). In holding that it had jurisdiction, it stated that "[a]fter the voluntary dismissal, there was nothing left for the district court to resolve, and the suit had ended as far as that court was concerned, thereby creating a final judgment." *Id*. at 790. Here, unlike in *Hope*, a claim continued to be litigated following the court's summary judgment dismissing most of the claims against the defendants—the claim against Young. The Young claim did eventually settle. Thus, the final decision occurred on December 6, 2023, when the district court ordered the case dismissed with prejudice after Young and Troupe filed a joint notice of settlement. Troupe filed a notice of appeal on January 4, 2024, within the 30-day period for filing an appeal. Troupe's appeal was timely.

## B. *Dismissal of Troupe's Claims*

We review de novo the grant of a motion to dismiss based on failure to state a claim under Rule 12(b)(6). *See Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir. 2017). Troupe's complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We "liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). "Threadbare recitals of the elements of a cause of action" are not enough. *Iqbal*, 556 U.S. at 678.

"A public official is entitled to qualified immunity unless: (1) their conduct violated a constitutional right, *and* (2) that right was clearly established." *Davis v. Buchanan Cnty.*, 11 F.4th 604, 623 (8th Cir. 2021). "Qualified immunity is 'appropriate where no reasonable fact finder could conclude that the facts when viewed in a light most favorable to the plaintiff show that the officers' conduct violated a clearly established constitutional right.'" *Id*. (quoting *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018)).

-11-

Are Troupe's "upon information and belief" allegations sufficient to state a claim? The defendants argue and the district court found that these allegations should not be considered. At the time of the district court's order, this court had not yet decided whether the "upon information and belief" allegations were permissible post-*Twombly*. However, we have since held them permissible if "the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Ahern*, 59 F.4th at 954 (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). *Ahern* follows the holdings of several of our sister circuits. *See Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012); *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267–68 (3d Cir. 2016) (unpublished); *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442–43 (7th Cir. 2011); *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021).

The district court, without benefit of our decision in *Ahern*, addressed whether the defendants controlled access to the facts alleged and whether the belief relied on facts that make an inference of culpability plausible. The district court concluded that the allegations were insufficient. Upon de novo review, we conclude otherwise. First, the type of information pleaded in these allegations is the type that was within the possession and control of the defendants. This is especially true in this case, where the individual who could have supplied information obviating "information and belief" allegations is deceased.

The defendants argue that Troupe could have conducted discovery prior to the ruling on the motions to dismiss. Using such discovery, they contend, Troupe could have obtained any information needed to properly plead facts not "peculiarly within the possession and control of the defendant." *Ahern*, 59 F.4th at 954 (internal quotation marks omitted). They point to *Hanover Insurance Co. v. Harding Enterprises, LLC*, 2018 WL 497528 (E.D. Mo. Jan. 22, 2018) (unpublished), for this proposition. *Hanover* is nonbinding precedent and is inapposite nonetheless. That

-12-

case involved application of Federal Rule of Civil Procedure 26(d)(1), which forbids discovery from any source before the parties have conferred. *Hanover*, 2018 WL 497528, at *3 (quoting Fed. R. Civ. P. 26(d)(1)). The defendants do not suggest that they met and conferred with Troupe prior to the court dismissing the claims on appeal.

The defendants' position would have required Troupe to seek a court order to conduct expedited discovery. *See Meritain Health Inc. v. Express Scripts, Inc.*, 2012 WL 1320147, at *1 (E.D. Mo. Apr. 17, 2012) (unpublished) (finding that because "the parties ha[d] not met and conferred," the plaintiff had to "seek a court order granting leave to conduct formal discovery" because Rule 26(d)(1) "provides that a party may not seek discovery from any source before the parties have met and conferred, unless 'authorized by these rules, by stipulation, or by court order'" (quoting Fed. R. Civ. P. 26(d)(1)); *see also Barton v. Proctor & Gamble Co.*, 2022 WL 2713107, at *2 (E.D. Mo. July 13, 2022) (unpublished) (same); *Thermo Sci. Inc. v. Arthur*, 2023 WL 6651541, at *1 (E.D. Mo. Oct. 12, 2023) (unpublished) (construing a motion to compel prior to conducting Rule 26(f) and Rule 16 conferences as a motion for expedited discovery because, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)" (quoting Fed. R. Civ. P. 26(d)(1))). Requiring a plaintiff to seek a court order for expedited discovery would undermine *Ahern*'s allowance of pleading on information and belief when "the facts are peculiarly within the possession and control of the defendant." 59 F.4th at 954 (internal quotation marks omitted). Such a requirement would effectively eliminate such pleadings. We hold that a plaintiff need not seek a court order for expedited discovery in these circumstances. This holding is consistent with our decision in *Ahern*, in which we distinguished our previous decisions rejecting these allegations in quiet title actions. 59 F.4th at 954–55. There, we said that "information regarding an unrecorded mortgage assignment is not necessarily in the sole possession and control of the defendant" because "the plaintiff likely has just as much opportunity as the defendant to locate an unrecorded assignment." *Id.* at 954. As stated in *Ahern*, "we cannot . . . expect [Troupe] to provide robust evidentiary support for [her] allegations at the pleading stage because,

-13-

in some contexts, that information may not be available to [her] before discovery." *Id*.

Troupe acknowledges that she had access to some public information records, but much of it was redacted and would not provide important information solely in the possession and control of the defendants. This includes jail records as well as the state of mind and knowledge that the defendants had of Catchings's condition. Specifically, Troupe's "upon information and belief" allegations sought two vital pieces of information that go to the subjective knowledge of the defendants. These were personal interactions with Catchings and internal discussions among the Jail staff regarding Catchings's condition. The defendants possessed and controlled this information.

### 1. The Correctional Officer Defendants[1]

Troupe alleged that the Correctional Officer Defendants denied Catchings medical care. We analyze this claim under the Eighth Amendment "deliberate-indifference standard." *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (applying the deliberate-indifference standard to a pretrial detainee's claim of failure to provide medical care in violation of the due process clause of the Fourteenth Amendment). This standard involves both objective and subjective analyses. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 920 (8th Cir. 2015). To meet the objective component, Troupe must plead facts sufficient to demonstrate that Catchings "suffered from an objectively serious medical need." *Jackson*, 756 F.3d at 1065. "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (internal quotation marks omitted). The subjective component requires Troupe to plead facts sufficient to show that the Correctional Officer Defendants each subjectively knew of Catching's serious medical need and deliberately disregarded that need. *Id*. "This showing

---

[1] Swims, Mohler, Kirkbride, Williams, Beard, and Oliver.

-14-

requires a mental state akin to criminal recklessness." *Id*. (internal quotation marks omitted).

Troupe did not allege that Catchings was diagnosed with leukemia prior to his death. Therefore, the medical need must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (internal quotation marks omitted).

The district court relied on *Jones v. Minnesota Department of Corrections*, 512 F.3d 478 (8th Cir. 2008), in finding that Catchings did not have an objectively serious medical need. The court in *Jones* upheld the grant of summary judgment to defendant prison officials on a claim of deliberate indifference to medical needs. *Id*. at 479. There, we held that the inmate did not have a medical need so obvious that a layperson would easily recognize the need for a doctor's attention. *Id*. at 483. The plaintiff's symptoms included the inability to stand or walk under her own power, not responding to officers' directions, rolling on the ground grunting and groaning, having dried blood and cuts on her lips, and a high respiration rate. *Id*. at 482.

*Jones*, however, is distinguishable. *Jones* emphasized that "the prison officials had no background knowledge that made it obvious that these symptoms required medical attention." *Id*. at 483. There was no indication that Jones had any medical problems prior to being told that she would be transferred from county jail to a state facility, indicating that it might not be a medical problem. *Id*. This was further supported by Jones's "behavioral problems, psychological problems, and incompatibility with other inmates." *Id*. Jones also never requested medical attention, so "[t]aking Jones's symptoms in context" of the behavioral and psychological problems, her "medical need [was not] so obvious that a layperson would easily recognize the need for a doctor's immediate attention." *Id*.

Here, Catchings had no behavioral issues. The Complaint alleged that he was healthy and active prior to 2019. Catchings also repeatedly requested medical attention. Finally, the Correctional Officer Defendants' background knowledge

supports the claim here that the medical need was sufficiently obvious to a layperson. This background knowledge is either partially or fully supported by Troupe's "upon information and belief" allegations regarding each of the Correctional Officer Defendants' personal interactions with Catchings or the internal discussions and conversations she alleged took place regarding his physical condition. As to each of the Correctional Officer Defendants, Troupe alleged that he or she personally observed or was aware of Catchings's deteriorating health and physical condition and took part in internal discussions and communications regarding that condition. Troupe alleged that the Correctional Officer Defendants had observed his deteriorating condition and discussed his symptoms. These symptoms included frequent vomiting, hearing loss, dizziness, a decreased level of physical activity, difficulty walking, need for a wheelchair, extreme weakness rendering him nearly bedridden, headaches, and visible weight loss.

We have held that a serious medical need exists when an inmate shows obvious signs of medical distress and directly communicates that distress to correctional officers. *See Gordon ex. rel. Gordon v. Frank*, 454 F.3d 858, 862–63 (8th Cir. 2006) (denying qualified immunity to officers who knew inmate was on high observation for heart disease and complained of chest pain and trouble breathing); *see also Plemmons v. Roberts*, 439 F.3d 818, 824 (8th Cir. 2006) (denying qualified immunity to officers when heart patient inmate was experiencing "classic heart attack symptoms"); *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003) (finding deliberate indifference by officers who ignored direct statement by inmate of his intention to commit suicide); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001) (finding deliberate indifference by officers who failed to perform CPR on inmate they knew had collapsed).

Catchings was not a heart patient like the inmates in *Gordon* and *Plemmons*. But the totality of his symptoms and the sufficient allegation that each of the Correctional Officer Defendants had knowledge of internal discussions related to these symptoms could establish that they had sufficient background knowledge to recognize the objective seriousness of Catchings's condition. Thus, Troupe

-16-

sufficiently pleaded an objectively serious injury that would be obvious to a layman and that the Correctional Officer Defendants were subjectively aware of that condition.

The final question is whether Troupe has sufficiently pleaded that the Correctional Officers Defendants' deliberate disregard for Catchings's condition rose to a level of criminal recklessness. *See Jackson*, 756 F.3d at 1065. This requires a showing of "more . . . than gross negligence." *Id.* (internal quotation marks omitted). Troupe fails to meet this standard as to Mohler. According to the Complaint, Mohler had multiple interactions with Catchings throughout the month of February 2019. On February 22, 2019, Mohler, along with Anderson and Walker, transported Catchings to court in a wheelchair after Catchings informed them that he was sick, weak, and vomiting. Then on February 26, 2019, Mohler witnessed Catchings vomiting during nurse Young's visit to Catchings's cell. Mohler confirmed to Young that he had witnessed Catchings vomit, and Young responded by saying Catchings was "faking" and that "[t]here [was] nothing wrong with him." R. Doc. 29, at 30. Despite Young's assessment, Mohler requested that Young schedule Catchings for a clinic visit, which Young agreed to do but never followed through on. Shortly thereafter, Mohler helped move Catchings to a cell on a lower level.

Considering these alleged facts as true, Mohler was, at most, negligent. In each interaction with Catchings, Mohler was not deliberately indifferent, but rather helped him. Troupe asserts that Mohler should have done more, but Mohler's alleged actions do not rise to the level of "criminal recklessness" required by our cases. *See Jackson*, 756 F.3d at 1065 (internal quotation marks omitted). "Qualified immunity 'protects officials who make bad guesses in gray areas.'" *Ledbetter v. Helmers*, 133 F.4th 788, 798 (8th Cir. 2025) (quoting *Est. of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018)). With respect to Mohler, Catchings's allegations are in a gray area.

-17-

Troupe also failed to allege facts showing Kirkbride disregarded Catchings's medical needs. The only allegation in the Complaint as to Kirkbride is that on the night Catchings died, Kirkbride "began doing rounds on his shift." R. Doc. 29, at 37. The allegation that Kirkbride was "on rounds" is insufficient to establish that Kirkbride deliberately disregarded Catchings's medical needs, let alone to establish that Kirkbride had the necessary mental state akin to criminal recklessness.

Troupe alleged that Swims, Beard, and Oliver responded to a report by Williams that Catchings was unresponsive. Swims then knocked on Catchings's door until Catchings lifted his head. Swims briefly conversed with him. Swims, Beard, and Oliver then left without providing Catchings further attention. Troupe has further pleaded that Swims, Beard, and Oliver took no additional actions to assess Catchings's condition or address it despite knowing his deteriorating condition. Like the officers' failure to perform CPR on the collapsed inmate in *Tlamka*, 244 F.3d at 633, these Correctional Officer Defendants' failure to require Catchings to stand or otherwise determine his need for medical assistance, if proven, would be deliberate indifference. Given the officers' alleged knowledge of Catchings's extensive symptoms and worsening conditions, their actions constitute "conduct sufficiently severe to evidence a [constitutional] violation." *See id.* Thus, they are not entitled to qualified immunity at the pleadings stage.

As to Williams, according to the Complaint, she had several interactions with Catchings during February 2019. During the second week of February, Catchings reported to Williams that he was having trouble hearing, could not walk, and could not eat without vomiting. Williams provided Catchings with a sick call form, which he completed and returned to her while expressing skepticism that anything would happen since his previous requests had obtained no results. On February 28, 2019, Catchings did not stand for count during Williams's rounds. When Williams banged on his cell door and received no response, she contacted Unit Control. Later that same night at approximately 9:00 p.m., Williams attempted to speak with Catchings through his cell door but simply walked away when he did not reply. Finally, at the

-18-

nightly sign-of-life check in which Williams was required by policy to make all inmates stand, she failed to require Catchings to stand.

Like Mohler, the allegations against Williams do not demonstrate that she deliberately disregarded his medical needs. She responded appropriately several times by providing a sick-call form when requested and contacting Unit Control when Catchings was completely unresponsive. Williams's decisions not to follow up when Catchings did not respond to her at 9:00 p.m. and to not require him to stand at the nightly sign-of-life check are "no cause for commendation." *Jones*, 512 F.3d at 484. But Troupe did not allege that Catchings was unconscious at that point or otherwise unresponsive to justify assignment of reckless disregard for his condition to Williams. *See id*. (holding that "however arguably negligent" the defendant's conduct seemed "in the clear light of hindsight," it did not rise to the level of deliberate indifference (internal quotation marks omitted)). Unlike Swims, Beard, and Oliver, who were responding to a report of unresponsiveness, the alleged interactions (or lack thereof) at 9:00 p.m. and 10:15 p.m. do not amount to a reckless disregard of Catchings's medical needs, but rather tend to infer negligence, or gross negligence at most. Williams is entitled to qualified immunity.

### 2. *Defendant Doucette*

At all relevant times, Doucette was the acting director of the County's Department of Public Health and had the responsibility for supervising medical staff providing care to detainees, including nurses Young and Byas. Troupe brings a claim against Doucette for failure to train or supervise. The Complaint did not allege any direct involvement by Doucette in the care or treatment of Catchings. Rather, the Complaint alleged that Doucette prescribed and issued standing orders that required medical staff to monitor and record vital signs and contact medical providers when detainees presented certain symptoms, including dizziness coupled with headaches or vomiting.

Troupe alleged that, under Doucette's supervision, medical staff routinely violated these standing orders in their treatment of Catchings. The Complaint further

-19-

alleged that Doucette knew of the staff's violations of her standing orders. She also knew of other ongoing failures by the Jail healthcare staff to follow policies and provide adequate health care to detainees with serious medical needs and that these deficiencies produced constitutional violations. Despite this alleged knowledge, Doucette purportedly failed to take sufficient remedial action through policy revisions, training, supervision, or discipline of her subordinates. Finally, the Complaint alleged that prior to Catchings's death, Doucette was aware of reports discussing inadequate medical care at the Jail that had been raised in the County's council meetings and other municipal forums, yet she still did not address these systemic issues.

"A supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka*, 244 F.3d at 635. But a supervisor may be held liable "if a failure to properly supervise and train [an] offending employee caused a deprivation of constitutional rights." *Id*. (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)). Troupe must have sufficiently alleged that Doucette "was deliberately indifferent to or tacitly authorized the offending acts" and that Doucette "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id*. (quoting *Andrews*, 98 F.3d at 1078).

To establish supervisory liability as to Doucette, Troupe must have sufficiently pleaded that Doucette had "notice of a pattern of conduct that was sufficiently egregious in nature." *Davis*, 11 F.4th at 624 (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)). Although generalized conduct is insufficient, other "very similar" misconduct can provide notice to the supervisor. *Id*. (quoting *Krigbaum*, 808 F.3d at 340).

The district court dismissed the claim against Doucette because "[Troupe] ha[d] not met [the] burden" to show "Doucette's supervisory liability as to Young." R. Doc. 70, at 13. However, Troupe did plead "[o]n information and belief" that Doucette was "responsible for the guidance and supervision" of Young, including

"review of [Young's] notes and records of interactions with patients and detainees." R. Doc. 29, at 22. Such information resides peculiarly in possession and control of the defendants. Troupe's allegation upon information and belief, at the pleading stage, for the reasons given above suffices.

Troupe plausibly alleged that Doucette was aware that (1) nursing staff, including Young, regularly violated standing orders to take vital signs as well as other systemic medical issues in the facility that led to jail deaths (evidencing a deliberate indifference to medical needs); (2) Doucette deliberately disregarded these problems by failing to discipline or otherwise take any action to remedy the problem; and (3) and this proximately caused harm to Catchings. At the pleadings stage, Troupe need only "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. It is plausible, based on the factual allegations in the Complaint, that a reasonable fact finder could conclude that Doucette had failed to train or supervise Young. To survive summary judgment, Troupe must present evidence as to Doucette's knowledge or notice of the Jail's medical care deficiencies. This evidence will need to show that Doucette tacitly authorized or deliberately disregarded those issues. *See Andrews*, 98 F.3d at 1078 (requiring evidence that supervisor had notice of inadequate training and supervision procedures and that it was likely to result in a constitutional violation).

### 3. *Defendant Murphy*

Troupe's claim against Murphy mirrors the claim against Doucette. Our analysis resembles that for Murphy. Troupe alleged that Murphy, the director of the Jail, failed to properly supervise and train the Jail's staff. Troupe also claims that Murphy had notice that nursing staff, including Young, routinely failed to follow standing orders, and that Murphy was aware of systemic issues within the facility resulting in several jail deaths. Troupe also alleged that Murphy was aware that correctional officers, including other defendants here, were violating standing orders to conduct sign-of-life checks to regularly assess the physical health of detainees. Troupe alleged further that Murphy took no disciplinary actions against Jail staff for

-21-

violations of these policies. She asserts that Murphy's training and supervision shortcomings produced an unqualified Jail staff.

We conclude that Troupe alleged sufficient facts to create a reasonable inference that Murphy failed to train or supervise other defendants. Troupe claims that Murphy had notice of egregious conduct: regular and systemic violations of Jail policy and health policy that led to correctional officers and health providers completely disregarding basic health and safety checks, at a time when Murphy and other Jail staff were aware of several recent jail deaths. Troupe states also that Murphy took no disciplinary action and that his failure to train and supervise led some Jail staff to not know these health and safety procedures even existed. Construing these allegations liberally in favor of Troupe, a reasonable fact finder could conclude that Murphy's conduct violated a clearly established constitutional right.

### 4. *The County*

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th. Cir. 2016) (cleaned up). To establish liability based on a custom, the plaintiff has to show the following:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th. Cir. 2013) (internal quotation marks omitted). Municipalities may be liable when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. (quoting *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[A] single deviation from a written, official policy does not prove a conflicting custom." *Id*. (internal quotation marks omitted).

Troupe's claims here must satisfy the same pleading standard as individual capacity claims. Specifically, she must have alleged facts sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Conclusory assertions that are unsupported by facts will not satisfy this pleading standard." *Watkins v. City of St. Louis*, 102 F.4th 947, 953 (8th Cir. 2024).

Troupe alleged three policies or customs: (1) a custom of correctional officers failing to require inmates to stand for sign-of-life checks; (2) a policy prohibiting correctional officers from scheduling detainees for the medical clinic to be seen by a registered nurse or medical doctor; and (3) a custom of allowing practical nurses to provide medical care without guidance or supervision from registered nurses or licensed physicians.

Troupe has failed to sufficiently plead facts that would establish municipal liability as to custom. The only facts in the Complaint that go to these unofficial policies are Catchings's treatment. However, Troupe must state sufficient facts to support a plausible claim for a "a continuing, widespread, persistent pattern" of such conduct. *Johnson*, 725 F.3d at 829 (internal quotation marks omitted). Troupe has not pleaded any factual allegations, outside of Catchings's personal experiences over a one-month span. Troupe's assertion that these unofficial policies establish a custom fails. *Compare id.* (holding that multiple incidents involving one plaintiff did not rise to the level of a "custom" when he failed to present evidence related to other inmates or that the time period was sufficiently long), *with McGautha v. Jackson Cnty.*, 36 F.3d 53 (8th Cir. 1994) (finding three-year period sufficient for the plaintiff

-23-

to establish custom) *and Bolderson v. City of Wentzville*, 840 F.3d 982, 986–87 (8th Cir. 2016) (holding that a single act and other "suspicions" failed to rise to the level of a "continuing, widespread, and persistent pattern of unconstitutional conduct"); *Meier v. City of St. Louis*, 934 F.3d 824, 828 (8th Cir. 2019) (testimony that police department "regularly" seized vehicles without a warrant pursuant to policy and accompanying training programs constituted evidence of a unconstitutional custom).

Troupe's claim as to the County's policy fails as well. "This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Johnson v. City of Ferguson*, 926 F.3d 504, 507 (8th Cir. 2019) (en banc). While there are claims for underlying individual liability, whether it be Young or those claims we hold sufficient here, there is no causal link between those underlying claims and this alleged policy. There is also no allegation that this policy was the "moving force" behind any constitutional violation. *Marsh v. Phelps Cnty.*, 902 F.3d 745, 752 (8th Cir. 2018). The underlying substantive violations are not connected to the alleged policy to prevent correctional officers from scheduling clinic visits. The alleged policy prevents correctional officers from scheduling clinic visits; Troupe did not allege that it prevented correctional officers from requesting a practical nurse to see detainees, that correctional officers were prevented from directly providing medical care in case of emergencies, or that correctional officers could not transport a detainee to a hospital in case of an emergency. Essentially, there is no allegation that the policy prevented Catchings from receiving medical care; the allegation only implies that it prevented Catchings from "receiv[ing] a particular or requested course of treatment." *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (internal quotation marks omitted). Troupe has failed to allege sufficient facts to state a plausible claim to relief as to an unconstitutional policy or custom.

Troupe also brings a failure-to-train-or-supervise claim against the County. This claim rests on more solid ground than the custom or policy claims. The County may be held liable if the "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Tlamka*, 244 F.3d at 635

(internal quotation marks omitted). The district court found that Troupe only brought "generalized allegations" that the defendants knew about "unspecified deficiencies in the provision of health care at the [Jail]." R. Doc. 70, at 51–52 (internal quotation marks omitted). However, the Complaint and the "upon information and belief" allegations therein do more than that. The Complaint specifically alleged that healthcare staff were not properly checking vital signs, that the County and its officials knew they were not checking vital signs, and that the County and its officials were not disciplining or otherwise supervising its healthcare staff to ensure the vital signs were being checked. Furthermore, as with Doucette and Murphy, Troupe alleged that the policymakers in question were aware of this practice and deliberately disregarded this failure to check the health of inmates. Thus, Troupe has stated a claim for relief that is plausible on its face as to the County's failure to train or supervise.

We emphasize that we express no opinion here today on the merits of Troupe's claims. There is an "often dispositive difference between reviewing dismissal at the summary judgment stage compared to the motion to dismiss stage." *Hageman v. Minn. Dep't of Corr.*, 2023 WL 4760732, at *1 (8th Cir. July 26, 2023) (unpublished per curiam). In *Hageman*, the pro se inmate pleaded no facts regarding whether the force used against him was applied maliciously, but we held that the facts the inmate did plead supported the inference that the officers had acted maliciously. *Id*. at *1–2. This is because "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Troupe has made sufficient factual allegations against Swims, Beard, and Oliver to state a plausible claim for deliberate indifference to his medical needs, and against Doucette, Murphy, and the County, to state a plausible claim for failure to train, supervise, or discipline. The merits of these surviving claims should proceed beyond the pleadings stage.

-25-

## C. *Motion for Relief*

Lastly, Troupe's final argument avers that the district court erred when it denied her Rule 60(b) motion. She sought leave from the court to file a third amended complaint and to seek limited discovery. We review the district court's decision for an abuse of discretion. *United States v. Mask of Ka-Nefer-Nefer,* 752 F.3d 737, 743 (8th Cir. 2014).

Troupe argues that the district court did not consider her motion for leave to amend her dismissed federal claims. She bases this argument on the district court's statement that "[Troupe] did not seek leave to amend [the state claims and the claim against Young], so the motion for leave to amend [was] denied." R. Doc. 79, at 2. Troupe suggests this statement means that the district court did not consider her request for leave to amend her complaint as to the dismissed federal claims. That is not the case. The district court, immediately after this sentence, addressed the dismissed federal claims and stated that it would "not reconsider its March 15, 2022 rulings [that dismissed the remainder of the federal claims], as it continue[d] to believe that the decision [was] correct and plaintiff ha[d] put forth no new law or facts demonstrating the prior decision was in error." *Id.*

Troupe's argument that the district court did not properly consider her leave to amend rests on little besides a conclusory statement that the "district court has discretion under Rule 60(b) to grant post-judgment leave to file an amended complaint if the motion is 'made within a reasonable time,' and the moving party shows 'exceptional circumstances' warranting 'extraordinary relief.'" Appellant Br. at 73 (first quoting Fed. R. Civ. Pr. 60(c)(1), then quoting *Mask*, 752 F.3d at 743). Troupe fails to identify what exceptional circumstances warrant this post-judgment relief and thus fails to identify any abuse of discretion.

## III. *Conclusion*

For the foregoing reasons, we reverse and remand the dismissal by the district court of the claims against Swims, Beard, Oliver, Doucette, and Murphy. We affirm the district court's dismissal of Mohler and Williams. As to the official capacity

-26-

claim against the County, we affirm as to the dismissal of the claims for an unconstitutional policy or practice but reverse as to the failure-to-supervise-or-train claim.

_____